PEOPLE v. BUCHANAN.

(Court of General Sessions, New York County. August, 1893.)

1. CRIMINAL LAW—ARREST OF JUDGMENT.
   Under Code Crim. Proc. §§ 331, 467, a motion in arrest of judgment can be granted only when the court has not jurisdiction of the subject-matter, or the facts stated in the indictment do not constitute a crime.

**2. SAME—TRIAL—SEPARATION OF JURY.**
  A jury in a murder case, not having agreed on their verdict at the adjournment of the court, were, by order of the court, taken to an hotel for dinner, under the charge of the sworn officers of the court. At no time were they allowed to separate. After dinner, while at the hotel, and after having agreed on their verdict, one of the jurors fainted, and became unconscious, and was removed by the jurors and the officers to a room in the hotel, where he remained until he had recovered. He was attended in the room by a physician. An officer of the court remained with him all the time. The other jurors were together in a room in the hotel until the sick juror recovered, when, together, they returned to the court room, and rendered their verdict. While the juror was sick several jurors left the main body to go to the room of the sick juror, to inquire as to his health, but always in the company of an officer. *Held*, that there was no such separation of the jury as to require a new trial under Code Crim. Proc. § 465, subd. 3, allowing one when the jury have separated without leave of court after retiring to deliberate on their verdict.

**8. SAME—MENTAL INCAPACITY OF JUROR.**
  After a jury in a criminal case had retired to deliberate on their verdict, and had agreed upon it, and were waiting the return of the court, one of the jurors fainted, and remained unconscious, and to an extent delirious, for some hours. On his recovery the jury returned to the court, and were about to render their verdict, when the judge, in view of the circumstances, suggested that they again retire for deliberation. They returned shortly, and rendered a verdict of guilty. On a motion to set aside the verdict because of mental incapacity of the sick juror, several physicians testified that from the statements of the circumstances the juror appeared to have had an epileptic fit, rendering him incapacitated to exercise his judgment for several hours before and after the attack. Other physicians, who made a personal examination of the juror some time after the attack, testified that in their opinion the juror suffered from nervous exhaustion only, not affecting his judgment. It appeared that after the discharge of the jury he returned to active business; that he was a man of good general health, and had had four fainting attacks in his life, all apparently the result of exposure of different kinds. *Held*, that the verdict would not be set aside

Robert W. Buchanan was convicted of murder in the first degree, and moves for an arrest of judgment, and a new trial. Denied.

De Lancey Nicoll and J. W. Osborn, for the People.
Charles W. Brooke, for defendant.

SMYTH, Recorder. The trial of this case commenced on the 20th of March, 1893, and was concluded on the 26th of April following by the rendition of a verdict convicting the defendant of murder in the first degree. Seven days were occupied in the selection of the jury from among about 200 talesmen who were examined as to their qualifications as jurors. The trial was an unusually protracted one, the evidence very voluminous on both sides, and mainly circumstantial and expert in its character, requiring a higher order of intelligence than is usually found in petit jurors, as well as great care on the part of the jury in its consideration. That the jurors selected possessed those requirements to a very high degree was conceded by both counsel for the people and for the defendant. A verdict having been ren-

dered against the defendant, and before judgment was pronounced upon it, the defendant moves—First, that the judgment be arrested; and, second, that the verdict be set aside, and a new trial awarded to him.

A motion in arrest of judgment can only be granted upon the following grounds: First, that the court has no jurisdiction of the subject-matter of the indictment; and, second, that the facts stated in the indictment do not constitute a crime. Code Crim. Proc. §§ 331, 467; People v. Kelly, 94 N. Y. 526; People v. Buddensieck, 103 N. Y. 487, 9 N. E. Rep. 44. The defendant's counsel, on the argument of this motion, conceded that the court had jurisdiction of the subject-matter contained in the indictment, and also that the count of the indictment upon which the conviction was had stated facts constituting a crime. Inspection of the record itself shows that the concession made by the counsel is correct, and it follows, under well-established rules of law, that the motion in arrest of judgment must fail.

The motion for a new trial is founded—First, upon the exceptions taken on the trial to the rulings of the court upon the admission and rejection of evidence, and upon the refusal of the court to charge certain specific requests submitted by the defendant's counsel. No exception to the charge itself was taken. I have given careful examination and consideration to the numerous exceptions appearing upon the stenographer's notes, and to the authorities bearing upon the questions presented by those exceptions, and have come to the conclusion that in the several rulings made by me upon the trial, so far as the admission and rejection of evidence is concerned, and in refusing to charge such of the requests as were refused, no error was committed prejudicial to the interests of the defendant.

The second ground upon which it is claimed that a new trial should be granted is based upon the alleged separation of the jury after the case was submitted to them, without the permission of the court so to do, and on the further ground that the verdict should be set aside because one of the jurors (Mr. Paradise) became so ill as to be physically and mentally incapable of performing his duty as a juror, and that the court erred in refusing to discharge the jury upon the application of the defendant's counsel for those reasons. It becomes necessary, for the proper determination of those two last mentioned grounds upon which the motion is made for a new trial and to set aside the verdict, to state the facts as they appear upon the record of the trial, and the additional facts presented by affidavits in support of and in opposition to the granting of the motion. Those facts appear to be as follows: On the afternoon of the 24th of April, the case was submitted to the jury, under the charge of the court, immediately after which the jury retired in the custody of officers, to whom the statutory oath had been duly administered. At 12 o'clock that night, the jury not having agreed upon a verdict, they were locked up in one of the jury rooms in the courthouse,

They remained there until the next morning, in the care of officers, and were then taken, under an order of the court, in a body to a hotel near the courthouse, accompanied by the officers having them in charge, for the purpose of obtaining suitable food, after which they again returned in a body, in the custody of the officers, to the jury room, and remained there until they were brought into court, at their request, for the purpose of having certain parts of the evidence read to them from the stenographic notes of the trial. This having been done, the jury again retired to their room in the charge of said officers. At 6 o'clock that evening, a verdict not having been agreed upon, the recorder, before whom the case was tried, left the courthouse for his home, having made an order that the jury should be furnished with suitable food, and should be taken in charge of sworn officers to the Astor House, a public hotel near the courthouse. Before they. were taken to the Astor House, pursuant to the requirements of the order of the court, and at about half past 6 o'clock, they notified one of the officers having them in charge that they had agreed upon their verdict, and that they desired to be taken into court. The officer was about to comply with the request of the jurors when he learned that the recorder had not yet returned to the courthouse. Within a short time thereafter the jury were taken. in a body to the Astor House, accompanied by five sworn officers. On arriving there they were taken to. a small private dining room, and while they were at dinner, in the care of the officers, Mr. Paradise, one of their number, became suddenly ill, fainted, and fell, or almost fell, from his chair, and was thereupon carried out of the dining room by one or more of the officers, who were assisted by several of the jurors, to an alcove on the same floor and close to the dining room occupied by the jury. A physician was at once summoned, who proceeded to examine the condition of Mr. Paradise, he being then unconscious, and, by his direction, Mr. Paradise was carried to a bedroom on the floor next above the dining room. The officers who carried Mr. Paradise to that room were assisted by several of the jurors. Mr. Paradise was placed upon a bed, and an officer continued in the room with him from that time to the time when Mr. Paradise was able to leave it. After the remaining jurors had finished their meal, they were removed from the dining room to said alcove, where they remained in the constant custody and under the supervision of the officers having them in charge. Between 8 and 9 o'clock of the same evening, the recorder, having returned to the courthouse, was informed by one of said officers of what had transpired at the Astor House. He sent for Dr. Stewart, the physician in attendance upon Mr. Paradise, examined him upon oath as to the juror's physical and mental condition, in the presence of counsel for both sides, and in this examination both counsel participated. The physician reported that Mr. Paradise was at that time in such a condition as to be neither physically nor mentally fit to be brought into court, or to perform his duty as

a juror. Under the direction of the court, the same physician returned to Mr. Paradise for the purpose of rendering to him such further medical care and attention as the necessity of his condition required, and to make a further examination, so as to be enabled to give to the court a definite opinion as to the probability of the juror recovering from his attack of illness sufficiently to enable him to continue the performance of his duty as such juror. At about 10 o'clock the physician again reported to the court the then condition of the juror. He was further examined by the court, under oath, in the presence of both counsel, and was again directed to return to the sick juror, and when, in his opinion and judgment, the juror was in such a physical and mental condition as to be able to perform his duties, and to be safely taken to the court, to permit it to be done. At about 11 o'clock the juror, in the opinion of the physician, having sufficiently recovered from his sickness, was assisted from the bedroom where he lay by officers and some of his fellow jurors, attended by the physician to the floor below, where the remaining jurors were, and then all the jurors in a body and in the charge of the officers left the hotel. On arriving on the street, Mr. Paradise, by the direction of the physician, was placed in a carriage, accompanied by one of the officers and his son. He was driven over to the courthouse, and the remaining jurors in a body walked from the hotel in charge of the remaining officers. After they reached the courthouse, they were joined by Mr. Paradise, and in a body entered the court room, and resumed their seats. The physician then reported to the court that Mr. Paradise had so far recovered from his illness as to be able to perform his duty, but that he was as yet somewhat weak physically from the effects of the attack of illness through which he had recently passed. The usual formality of calling the names of the jurors was then proceeded with by the clerk, and, each juror having responded as his name was called, the foreman announced that the jury had agreed upon their verdict. Before he declared what the verdict was, the court addressed the jury, stating to them briefly and substantially the facts as above detailed, and advised the jury to retire to a room which had been prepared for them in the court building, and further consider of their verdict. This was deemed advisable, under the circumstances of the case, and as a matter of precaution, based upon the facts which were then in the possession of the court as to the condition of Mr. Paradise. The jury retired, and shortly afterwards returned in a body to the court room. Again each responded as his name was called by the clerk, the foreman announced the verdict of the jury, and, on being polled at the request of the defendant's counsel, each juror confirmed the verdict as the same had been announced by their foreman.

I have thus far stated the facts as they appeared bearing upon the question of the separation of the jury and the cause of such separation up to the time of the rendition of their verdict. I will now proceed to state the additional facts established by the affida-

vits presented on the part of the defendant and the people, which bear upon the question now under consideration. Thomas R. Barrett, a night watchman employed in the Astor House, states in his original affidavit that while he was sitting at the head of the stairs leading to Vesey street, he saw the dining room door open, and several men come out, bearing with them the body of another man, whom they laid on the floor of the alcove. This man seemed very ill, he was suffering apparently from convulsions, twitching violently, and requiring the strength of three or four men to hold him down. A doctor was sent for, who treated him, and then, with the assistance of "some of the others," carried him upstairs to room 7, on the floor above, where the man was left in care of the physician. Some of the jurors, he says, remained downstairs in the alcove, and some went up with the doctor; that "they were constantly running backward and forward to the sick man's room, not in a body, but singly, or in twos and threes," and "one of them went downstairs or around the hall in the direction of the bar and closets;" that "about eleven o'clock they brought the sick man down, two men holding him by the arms, put him in a cab with the doctor," and the balance of those above referred to, who were running around and going back and forth to his room and waiting in the alcove, went away in a body. Waverly E. Scott, a hallman in the Astor House, states that he saw the jurors in this case in a body; that he knew them to be the jurors,—having been told so; that one of them became sick, and was taken to a room, and was left there for two hours; that he saw him when he first became sick, lying on the floor, and the others all around him, and when he came downstairs, assisted by two men, and went away; that while the sick man was lying upstairs the jurors were roaming around the hall near the alcove; some would run up to the sick man's room, leaving the others, and some remained upstairs with him; and that about nine o'clock he was asked by a gentleman, who left his fellows, to forward a telegram, the gentleman at the time giving him the money to pay for it; that he did so, and returned and reported to the juror. Thomas E. Franceville, one of the jurors, in his affidavit, states that the jury were taken in the custody of the officers to a room in the Astor House for the purpose of dining; that this room opened upon the hall, as did the public dining rooms and public parlors of the hotel; that while Mr. Paradise was seated at the table with the other members of the jury he became suddenly ill, and was about to fall from his chair. Some one caught him as he was in the act of falling, and in the excitement several of us carried him out, "probably with the assistance of officers," to the alcove room, on the floor of which he was laid. He went down like a shot, was unconscious, was supported and held by several persons. A physician was sent for, who shortly appeared, finding him still unconscious. He was subsequently removed to a room upstairs, where he remained several hours. That several of the jurors went to his room, not in a body, but two or three at a time, and were constantly running

up and down stairs, reporting his condition. The guests of the hotel were passing through the corridor, and that "a person, said to be a Herald reporter, and the servants, mingled about us." That while Mr. Paradise was confined to the room above, those of the jurors who were not running backwards and forwards to and from his room were either lingering about the alcove or wandering about the corridor of the hotel. That one was missed from among them, and was seen coming from the direction of the stairs which led to the barroom and public water-closets, alone. This comprises all the evidence presented on the motion by the defendant bearing upon the question of the separation of the jury. The affidavit of Mr. Franceville was objected to by the district attorney, upon the ground that jurors will not be permitted to impeach or in any way impair their verdict. This objection, under well-settled rules of law, is fatal to the consideration of Mr. Franceville's affidavit. Dalrymple v. Williams, 63 N. Y. 361; Williams v. Montgomery, 60 N. Y. 648. The affidavit was read, subject to the objection of the district attorney, and, while I recognize the rule above cited, I have deemed it proper to look into this affidavit so far as the statements therein contained refer to the separation of the jury.

In opposition to this branch of the motion, the district attorney read the affidavits of the five officers having charge of the jury, and of ten of the jurors, and also the affidavits made by Barrett and Scott in explanation of material statements contained in the original affidavits made by them, which were read by defendant's counsel. The testimony of the court officers and jurors clearly and conclusively, in my opinion, establishes the following facts: (1) That the officers were duly sworn in the manner required by law, and were placed in charge of the jury, and that at no time while the jury were at the Astor House were they permitted to separate, and that they did not separate unaccompanied by one or more of said officers. (2) That the juror Paradise, from the time he became ill, and until the jury were discharged by the court, having rendered their verdict, was in the constant care of one of said officers; that when he was being removed from the dining room to the alcove, and from thence to the bedroom on the upper floor, he and the jurors who assisted in his removal were in the constant care of said officers. (3) That the main body of the jurors, after they had finished their meal, were removed from the dining room to the alcove by the officers having them in charge, and there remained in their care and under their constant supervision. (4) That on several occasions after the removal of Mr. Paradise from the alcove to the bedroom some of the jurors left the main body in the alcove, and proceeded to the room of Mr. Paradise, always accompanied by officers, for the purpose of ascertaining the condition of Mr. Paradise and the prospect of his recovery; that on those occasions the main body of the jury remained in the alcove in the care and under the supervision of said officers. (5) That none of the jurors conversed among themselves about the case, and

that no person was permitted to or did approach them or converse with any of them in reference to the case. (6) That Mr. Farrell, one of the jurors, delivered a telegraphic dispatch to the hallman, Scott, for the purpose of having it forwarded to his family; that the only conversation that occurred between him and Scott was to give the necessary directions as to how the dispatch should be forwarded. (7) That the juror Paradise, having sufficiently recovered from his illness, joined the remaining 11 jurors, and was taken from the Astor House, by direction of the physician, in a carriage, to the courthouse, in charge of one of said officers, and in the company of his son, and that the remaining 11 jurors were taken in a body, in the care of officers, to the courthouse, where they rejoined Mr. Paradise, and thereupon the jury, in a body, entered the court room, and resumed their seats in the jury box. The testimony of Barrett and Scott, referring to the separation of the jurors, is materially affected and weakened by the affidavits subsequently made by them. Barrett now says that he did not know the officers who had charge of the jury, and could not distinguish them from jurors; that he did not know whether the men whom he stated were running backwards and forwards to the sick man's room were officers or jurors, nor does he know that the person he saw going downstairs and around the hall in the direction of the closet was a court officer or a juror. Scott says, in his subsequent affidavit, that he could not distinguish the officers from the jurors, and that he did not intend to say in his original affidavit that the jurors were roaming around the hallway near the alcove; that he did intend to say that they were roaming around the alcove, and that the only time he saw the jurors in the hallway was when they went from the dining room to the alcove, and when some of them went upstairs to the sick man's room. He further says that he is unable to distinguish between the officers and the jurors.

A most careful review of all the evidence bearing upon the question now under consideration, leads me to the conclusion that the separation of the jury was not an improper one, nor was it of that character which the law prohibits and condemns. That it was caused solely by the sudden illness of Mr. Paradise is clearly proved, and is not controverted, and it also appears that at no time were any of the jurors separated from their fellows except when some of them assisted the officers in carrying the sick man from the dining room to the alcove, and from thence to the bedroom on the floor above, and on the occasions when some of them left the main body of their fellows, and then in the custody of officers to go to the sick man's room, and for the sole purpose of inquiring as to his condition.

It is not alleged in the moving papers that any of the jurors were approached, or that any person conversed with them about the case, or attempted to do so, or in any way to influence them, and but a single act of alleged impropriety on the part of any of the jurors was charged, viz., that one of their number was seen

in the hall leading to the barroom and water-closets of the hotel, and unattended by an officer. The name of the supposed juror is not stated, nor is it claimed that any one saw him, or that he was in the barroom of the hotel, or that he was off the floor where the main body of the jurors were in charge of officers. Mr. Franceville, who made this vague allegation, when requested by the district attorney to furnish him with the name of the supposed juror, states that, while he recalls the incident stated in his affidavit, he cannot recall the name of the juror therein referred to. It is very clear to my mind that at the time he made the affidavit containing this statement he was laboring under a misapprehension in supposing that the person referred to by him was a juror, and it is affirmatively shown by the affidavits of 10 of the jurors that no such incident occurred, and their testimony on that point is confirmed by that of the officers having the jury in charge. Section 465 of the Code of Criminal Procedure provides that a new trial can be granted only in the cases therein specified. That section also provides that the court in which the trial was had has power to grant a new trial when a verdict has been rendered against the defendant by which his substantial rights have been prejudiced in the case. People v. Bradner, 107 N. Y. 1, 13 N. E. Rep. 87. Subdivision 3 of said section is as follows:

"When the jury have separated, without leave of the court, after retiring to deliberate on their verdict, or have been guilty of any misconduct by which a fair and due consideration of the case has been prevented."

I fail to discover, after careful examination of all the evidence bearing upon this question, that the separation of the jury, under the circumstances, was such as is prohibited by law, nor can I find anything in the evidence which would justify even an inference that there was any misconduct on the part of the jurors as a body, or on the part of any one of them, by which a fair and due consideration of the case was prevented, or any substantial right of the defendant infringed upon. The separation of Mr. Paradise from his fellows was not a voluntary act on his part; it was not caused by any willful or improper act of his or of any of his fellows. The evidence clearly establishes this to be the fact. It was caused by a power to which all mankind must submit, and it seems to me, under all the decisions bearing upon this question, that the acts of some of his fellow jurors in separating from the main body for the humane purpose of rendering assistance to the officers in the removal of Mr. Paradise from one room to another in the same hotel, and their subsequent visits to him, accompanied, as they were, by officers, and for the mere purpose of ascertaining the state of his health and the prospect of his recovery, was not such a separation of the jury as the law prohibits and condemns. But, assuming that the separation which occurred in this case was of itself sufficient to raise a presumption of misconduct on the part of the jurors by which the substantial rights of the defendant might in some way have been impaired, that presumption has been

overcome by the affirmative and positive evidence of the officers in charge of the jury and that of 10 of the jurors. It has been repeatedly held that such a separation of the jury as took place in this case is not within the statute, and that when the separation was caused solely by the stress of such necessity as existed here, it is incumbent on the part of the defendant to show that he has been prejudiced thereby. No such proof has been offered on this motion. Section 465 of the Code of Criminal Procedure merely enacts a rule of the common law, and the scope of its application has been strictly limited to cases of gross violation of the rule that no separation of the jury shall take place, and where it is made to appear that such separation actually and probably did substantially affect the rights of the defendant to his prejudice. People v. Menken, 36 Hun, 91; People v. Douglass, 4 Cow. 26; People v. Draper, 28 Hun, 1; People v. Carnal, 1 Park. Crim. R. 256; Com. v. McCauley, (Mass.) 30 N. E. Rep. 76; 1 Bish. Crim. Proc. § 999; Titus v. State, 49 N. J. Law, 36, 7 Atl. Rep. 621; People v. Montgomery, 13 Abb. Pr. (N. S.) 207; People v. Gaffney, 14 Abb. Pr. (N. S.) 36.

Before the verdict was recorded, the counsel for the defendant objected to its reception, upon the ground that the examination of the physician who attended Mr. Paradise, and that of Mr. Paradise's son, indicated the absolute inefficiency, incapacity, and inability of Mr. Paradise to join in the deliberation necessary to a verdict; that, upon the medical testimony then before the court, it was apparent that Mr. Paradise was mentally unable to confer with his fellow jurors or join in their deliberations as to what their verdict should properly be. The medical evidence then before the court, and upon which it concluded that the objection was not well taken, was that of Dr. Stewart, who had been examined under oath both by the court and counsel, as already stated. Dr. Stewart testified that when he was called upon to attend the juror, at about 8 o'clock, he found him lying on the floor perfectly unconscious. His heart was very weak, and as the doctor looked at him he thought it was simply a fainting fit,—"syncope." He administered brandy and other remedies, by means of which he brought the juror around enough to open his eyes and to call for his wife. He continued twitching, although still retaining consciousness as much as to partially open his eyes and look around, and asked others where he was. He was then carried upstairs, his coat and vest taken off, his clothes loosened, and he was laid on a bed, and ice cloths put to his head. He said he felt very much better, and he was rational enough to say that. He called for his wife, and cried out that he did not poison that woman, and that Buchanan came to him on Sunday and told him he had poisoned his wife. That he found him getting more delirious, so far as talking was concerned, and, for the purpose of quieting him, he administered a small quantity of morphine, which, for a moment, partially quieted him, but not amounting to anything. At this time the doctor considered the attack the juror was suffering from nervous exhaustion, caused by the severe strain which

he had undergone, and, in his opinion, he was not then in a condition to perform his duty or to be brought into court. A further report was made at about half past 10 to me by the doctor as to the then condition of the juror. By this report it appeared that on his returning to the juror he had found him sitting up in bed, and rational. The juror informed him, in answer to questions put by him, that he had been subject to these attacks, and that the last one occurred in December; that his family physician told him he was suffering from nervous prostration. Dr. Stewart questioned the juror closely for the purpose of ascertaining whether the attacks were epileptic in character. In his answers to these questions he gave no history of epileptic attacks, but did state that he had consulted a physician while in Germany, and was informed by him that his nervous system was very weak, and that he should under no circumstances undergo severe excitement. The juror then wanted to come to court, and said that he was all right, but Dr. Stewart recommended that he should remain for a short time longer where he was, and keep himself quiet, and that if he did so he would be in a condition to return to the court within an hour, and to discharge his duties in a rational manner. Being questioned by the defendant's counsel, the doctor stated that when he last left the juror he was perfectly rational, but a little weak physically. The doctor again returned to the juror, and about 11 o'clock, the juror having been brought to the courthouse, the doctor informed the court that he was then mentally capable of performing his duty, and to clearly understand what he was doing. This was all the evidence before me as to the mental and physical condition of the juror at that time; and upon it I determined that, although the juror had been taken suddenly ill, and was for a time mentally and physically incapable of performing his duty, he had then sufficiently recovered from his attack of illness, and was fully able to perform the duty imposed upon him by law.

Section 416 of the Code of Criminal Procedure provides that:

"If before the conclusion of the trial, a juror becomes sick, so as to be unable to perform his duty, the court may order him to be discharged, and another jury to be then or afterwards impaneled."

Under this section of the statute, it clearly became the duty of the court to investigate the cause of the juror's illness, and if, upon such an investigation, the court ascertain that the illness was of such a character as to render the juror unable to perform his duty, he might discharge him, but not otherwise.

Section 428 of the Code of Criminal Procedure provides that:

"After the jury have retired to consider their verdict they can be discharged only (1) upon the occurrence of some injury or casualty affecting the defendant, the jury or some one of them or the court, rendering it inexpedient to keep them longer together."

It is clear that the casualty mentioned in this section of the statute must be such as in the judgment of the court to render the further keeping of the jury inexpedient. The necessity must

be imperative. Illness of a juror is not, of itself, a sufficient ground to justify the court in discharging the jury; it must be of such a character as to render the juror unable, at least within a reasonable time, to perform his duty, and, when that fact is established to the satisfaction of the court by proper evidence, a case of inexpediency of keeping the jury longer together is shown, calling for the exercise of the discretionary power vested in the court to discharge the jury. The evidence of Dr. Stewart, to which reference has been made, clearly shows that the case did not come within the provisions of the statute, or of well-established rules of law governing such cases. The facts, as testified to by Dr. Stewart, show that the illness of the juror was only temporary; that it had passed over; and that he was able, when brought into court, to perform the duty imposed upon him by law. "If one of the jurymen be taken ill during the trial, though of a capital offense, so as to be incapable of agreeing in the verdict, or die, the jury may be discharged, though the evidence of the crime is nearly gone through; and the prisoner must be tried afresh. If a juryman be taken ill, another juryman may be permitted by the court to attend him, accompanied by a bailiff sworn to remain constantly with him, and, on his return, he may himself be questioned on his oath to make true answers as such questions as the court shall demand of him as to the state of the individual whom he has left; and if it appear from his evidence that there is a probability of the juror speedily recovering, he may be allowed proper refreshment, but if there be no probability that he will be able to return to pursue his duties, a new panel may be ordered, returnable instanter, upon which all the others are competent to serve." 1 Chit. Crim. Law, p. 269. In Reg. v. Newton it was held that if, after the jury are locked up to consider their verdict in a capital case, the judge will allow a medical man to see him, and anything which he will give as medicine he may have, but not sustenance; but if it be proved by the medical man that if one of the jurors is further confined it will be dangerous to his life, and the jury state that they are not likely to agree on their verdict, the judge will discharge them, but not from any consideration of the time during which, they had been locked up. Reg. v. Newton, 3 Car. & K. 85. To the same effect are the cases of Rex v. Barrett, Jebb, Cr. Cas. 104; Rex v. Scalbert, 2 Leach, 620; Reg. v. Beere, 2 Moody & R. 472; Rex v. Edwards, 4 Taunt. 309. In Com. v. Clue two jurors were taken ill after the jury had retired to deliberate upon their verdict. They were confined over a day, apparently without refreshment. A physician was appointed to visit the jurors in their room, and, after examination, reported that the life of one juror was not in immediate danger, but that he was ill, and that his health would be endangered if he continued to remain in his present state of privation; whereupon the court discharged the jury. This, on appeal was held to be error, Gibson, C. J., saying that food and refreshment should have been furnished, to recruit their forces.

It is only in the absence of a probability to perform his (the sick juror's) duties that a new panel may be ordered. There is no doubt but that the indisposition of the two jurors would have been speedily removed by appropriate nourishment, and their temporary exhaustion was not an available ground to divest the interest the prisoner had in the verdict. Com. v. Clue, 3 Rawle, 503. In Nichols v. Nichols the court adjourned from Friday to Monday, the jury being left in charge of an officer, with directions to discharge them when they agreed. After the judge had left the court, the foreman told the officer in charge that the juror was sick with a chill, and required brandy. The officer saw the juror, thought he was sick, sent for brandy, which he delivered to the foreman. Afterwards another juror fell upon the floor in a fit. A physician was sent for, who administered to the juror, and he recovered. Subsequently the jury agreed upon a verdict for the plaintiff, sealed it, delivered it to the officer, and were discharged. On appeal, Allen, J., said:

"The question of the effect of the introduction of the physician into the jury room for the purpose of giving medical aid and relief to the juror, who appears to have stood in pressing need thereof, is not free from difficulty. It is, however, obvious that a merely temporary attack of sickness, though it may for the time being incapacitate the juror, is not a necessary ground for the discharge of the jury. It is proper, when the circumstances will admit, to await the result, and see if, within a reasonable time, he so far recovers as to enable the trial to proceed, or a verdict to be returned. If such sickness is brought to the attention of the court while the jury are deliberating on their verdict, and medical attention appears to be necessary, the better way would ordinarily would seem to be for the court to select a suitable physician, and to caution him in advance not to converse with any of the jury upon the case, except such as may be connected with the immediate relief of the disorder. The court must have the power, in its discretion, to allow suitable and necessary medicine and medical attention to be furnished to the jury; and, indeed, it is its plain duty to see to it that such are furnished in case of urgent need. In the present case [as in this] the judge was not accessible at the time, but nothing appears to have been done differently from what may well have been ordered by him. The officer and physician were both competent as witnesses to testify as to the extent of their communications with the jury, and there is no reason to suppose that either of them said anything to any juror which in any way bore upon the case under consideration, or that the sources of substantial justice were to any extent perverted by what occurred. This was a matter especially for the presiding judge to investigate. * * * In the various emergencies which are liable to occur irregularities must occur sometimes, while the court will always seek to guard against them, and especially to keep the jury as far as possible from all influences which can cast a suspicion upon the integrity of their verdict, it nevertheless ought not to be swift to grant a new trial on account of irregularities not attended with any intentional wrong, and where it is made satisfactorily to appear that the party complaining has not and could not have sustained any injury from them." Nichols v. Nichols, 136 Mass. 256; Goersen v. Com., 106 Pa. St. 477.

It would seem, therefore, to be clear, from the above authorities, that upon the case as it stood when the motion was made to discharge the jury no error was committed in refusing to grant the motion.

The second branch of the motion to set aside the verdict against the defendant is based upon the opinions as to the mental capacity

of the juror Paradise, expressed in affidavits made by each of the following named physicians, viz. Drs. Hamilton, Dana, Gray, Morton, and Hammond.    The opinions of Drs. Hamilton and Dana are formed upon the testimony of Dr. Stewart, who attended the juror during his illness at the Astor House; of Harry Paradise, son of the juror; and upon the affidavits of Thomas R. Barrett and John H. Welsh.    Those of Drs. Gray, Morton, and Hammond are founded upon the same testimony, and also upon the affidavit of Mr. Franceville, one of the jurors in the case.    Dr. Hamilton says that, after a careful consideration of the evidence presented him, he has arrived at the opinion that Mr. Paradise had probably for some time been the victim of nervous diseases; that the attack occurring at the Astor House was of an epileptiform character, as shown particularly by the statements of Dr. Stewart and of the affiant Barrett; that it is clear that the attack was simply the climax of a state of very great nervous excitement and mental strain, and that the disorder and confusion of state which permitted Paradise to say, "I didn't poison that woman," in all probability began some hours before the actual mental explosion, and was an expression of gradually deranged judgment, which rendered him unable to properly weigh the grave issues which finally resulted in the conviction of the prisoner.    The genesis of these delusions, he says, he cannot but believe from his experience to be a sudden occurrence, and to be simply a post-epileptic expression.    He is, moreover, clearly of the opinion that at no time before midnight was the juryman able to intelligently and clearly weigh the facts of the case, or form an unbiased opinion; and he adds that it would furthermore appear from the affidavit of John H. Welsh that the vote for the conviction given by said Paradise was not that of a free agent, and strengthens the conclusion he has already expressed regarding the volitional impairment of the sick juror.    Dr. Dana bases his opinion upon the same evidence upon which Dr. Hamilton acted, and states it to be his opinion that the juryman suffered from an epileptiform attack; that, that being the case, the presumption, in his opinion, is that the man's mind was not clear and sound and capable of judgment for at least three hours after the attack.    He further says that in a personal experience with over 200 epileptic cases, having seen many seizures, he has always found the severe convulsive seizures of the type which Mr. Paradise appears to have had followed by a nervousness, feebleness, and confusion of thought, or by an actual delirium or mania lasting for several hours, and that such seizures are sometimes preceded by mental disturbances also, and at times they are simply the expression of a certain form of insanity.    Dr. Gray, in his opinion, based upon the same evidence which was before Drs. Hamilton and Dana, and also upon the affidavit of Mr. Franceville, says that he is positively of the opinion that the attack was epileptic in character, and that the juror was laboring under what is commonly termed an "epileptic fit;" that the circumstances to which his attention had been called indicate that such epilepsy was of

confirmed condition, and had apparently been of long continuance; that the evidences of previous convulsive seizure in the history of the juror as given to the attending physician are indicative of a probably permanent epileptic condition, and that the symptoms seemed to be susceptible of no other explanation except that which would illustrate a convulsive seizure, due to organic disease of the brain; that Mr. Paradise's case was evidently a symptom of organic disease of the brain, so that he went into the jury box therewith evidently, had its explosion in the past, as is illustrated by his previous attack, and that the organic affection is further suggested by his subsequent conversation with Welsh; that his intellectual reasoning faculties had, for some hours prior to the seizure, and certainly for some hours thereafter, been disturbed, confused, and perverted, his judgment suspended, and that he was the creature, not of his will, but of his unfortunate malady, and that, under such circumstances, he should regard his mental action as unreliable, and its results as valueless, and should consider him incapable of arriving at any rational conclusion where judgment would be indispensable; and in summing up his judgment and opinion he declares it to be his belief that the juror, subsequent to the attack referred to, and in all probability for hours before, was incapable of exercising any intelligent judgment, and of appreciating and weighing the important question submitted to him for decision, and that he should regard his mental action as perverted and valueless, because of the absolute suspension of all control over his reasoning faculties.    Dr. Morton, in his opinion, which is based upon the same evidence as that upon which Dr. Gray acted, says that he is positive that the attack was epileptiform in its character, and indicated apparently a permanent epileptic condition; that the symptoms described in the testimony and affidavits were the special symptoms of an epileptic fit, and that there could be but one other explanation of such an attack, and that would be the convulsive seizure of general paresis, in which case his mental responsibility would be still more irresponsible than if the attack was epileptic; that, subsequent to the attack, the juror was incapable of exercising any intelligent judgment, and prior to it probably the same condition existed for many hours, and that he should not regard the juror's mental action during the influence of such an attack as of any value whatsoever, reason and judgment being entirely suspended.    Dr. Hammond also arrived at his opinion upon the same evidence upon which Dr. Gray acted.    He says, judging from the matters presented to him as aforesaid, he has no hesitation in expressing the opinion that Mr. Paradise had an epileptic seizure, and the probability is that he had suffered from many similar attacks for a long time.    This, he says, is sufficient for him to form the judgment that he suffered from organic epilepsy; that he has no doubt for several hours preceding the attack, and for several hours following, the juror's mental condition was weakened or perverted to such an extent as to render its manifestation valueless; he was incompetent to exercise his reasoning faculties

and his judgment in a normal manner; that he, Dr. Hammond, unhesitatingly is of the opinion that the juror was mentally and morally unfit to serve upon a jury, and incapable of intelligently discharging his duties and responsibilities in such capacity; that the juror was unable to confer with his fellows in the matters involved, or to confer in understanding or appreciating any result of verdict; that he was mentally unfit to serve as a juror at all. He adds that, although from the data presented to him the proof is not conclusive, yet there is sufficient to warrant his belief that the juror was and is suffering from general paresis.

The district attorney read, in opposition to the case thus presented by the moving papers, and on this branch of the motion, (1) the affidavits of Mr. Paradise, his wife, those of 10 of his fellow jurors, of Richard Schram and Joel A. Kraus, and also certain letters written by Mr. Paradise to his wife and to Mr. Richard Schram, his employer, during his absence from New York in May and June; (2) the affidavits of Drs. Pritchard, Schram, Carlos F. McDonald, Starr, and Alexander E. McDonald.

I propose to consider (1) that part of the evidence which bears upon the history of Mr. Paradise's life and occupation, so far as the same is disclosed by it; (2) that which refers to Mr. Paradise's conduct and actions from the time he was sworn as a juror, and down to the time the jury was discharged; (3) that which refers to Mr. Paradise's actions after the discharge of the jury; (4) that part which refers to the conversation which it is alleged took place between Welsh and Paradise on the 3d of May last; and (5) the testimony of the medical witnesses bearing upon the question of Mr. Paradise's mental condition before and at the time of the rendition of the verdict, and subsequent thereto.

1. It appears that Mr. Paradise was born in Germany, in the year 1851. That he came to the city of New York in the year 1872, and that from that time he has been constantly and actively engaged in business as a merchant in this city, for several years on his own account, and latterly as an employe. He was married in 1874, and is the father of two children. That during all this time he appears to have been in the enjoyment of more than ordinary good health, and in the full possession of all his mental faculties, except on four occasions, when he became temporarily unconscious when suffering from fainting fits. Those fits occurred at long intervals, were not severe in their character, and lasted but a short time, and did not interfere with the intelligent prosecution of his business. The first of those fits was produced by his being overheated; the second, by nervousness brought on by insomnia; the third, by excitement and grief, caused by the death of his father; and the fourth was the fit which took place in the Astor House, in this city. Mr. Paradise's evidence as to his occupation and general good health is corroborated by his wife, his present employer, and by Drs. Pritchard and Schram, both of whom for several years attended him and his family professionally. Dr. Schram states that during the time he knew him,

which was for over seven years, he frequently saw him; that in May, 1888, he treated him for malarial headache, from which he recovered in a day or two. In May, 1889, he treated him for malarial fever, which confined him to his bed for two days. In June, 1890, he treated him for grip, which confined him to his bed for about a week, and in March and April following he suffered from a slight attack of nervous prostration, caused by the grip and overwork, but was not confined to his bed. In September, 1890, he had a slight attack of cholera morbus, which confined him to his bed for part of a day. In January, 1891, he had a like attack, from which he recovered in 24 hours. On two occasions he knew Mr. Paradise to have fainted, the first caused by headache of malarial origin, and the second caused by exhaustion consequent on fever. The doctor adds that none of the attacks were serious, and that he considers him to be a man whose general health was good; that during his treatment of him he did not observe any symptoms of an epileptic form or character; and that he is positively of the opinion, formed upon his knowledge of Mr. Paradise, that he has not paresis or epilepsy, or any form of either. Dr. Pritchard was the family physician of Mr. Paradise for four years, and his testimony is to the same effect as that of Dr. Schram.

2. The Conduct of the Juror Paradise. When Mr. Paradise was called as a juror, he was challenged by the district attorney, who submitted him to a searching examination as to his qualifications and fitness as a juror. His answers to the questions put to him show that he was an intelligent and conscientious man, able to distinguish between circumstantial and direct evidence, and that he understood the rules of law governing that class of evidence, and the duties of a juror. His answers were so clear and satisfactory that the defendant's counsel did not deem it necessary to renew the challenge, and accepted him as a juror, and he was thereupon sworn. Mr. Trede, the foreman of the jury, states that during the progress of the trial he found Mr. Paradise in all his acts and conversation to be rational and extremely intelligent; that, from the beginning of the deliberations of the jury, he entered into their discussion with great intelligence, and showed himself to be thoroughly familiar with the evidence in the case. Mr. Wortman, another of the jurors, says that during the progress of the trial he found Paradise in all his acts and conversations to be rational and extremely intelligent; that on the second ballot the jury stood nine for conviction of murder in the first degree, Mr. Paradise being one of the nine who so voted; that the jury agreed upon their verdict about a quarter past 6 o'clock P. M., and that at about 8 o'clock of the same evening Mr. Paradise fainted, while at dinner; that after the jury were brought into court, and were ready to render their verdict, but before doing so, they, by direction of the recorder, retired from the court room to a room provided for that purpose, and again balloted; that Mr. Paradise said, in substance, on that occasion, that, inasmuch as

his capacity to perform his duties had been called in question, he wished to show them that he was now perfectly recovered, and capable of performing his duty, and he then and there wrote his ballot, and the affiant further states that at all times while in his presence Mr. Paradise's acts and conversations were perfectly. rational. Jurors Miller, Segrave, Geischen, Bopp, Farrell, Thomas, Adams, and Nickerson fully corroborate the testimony of Mr. Trede, their foreman.

3. As to the actions of Mr. Paradise after the verdict was rendered and recorded, he (Mr. Paradise) testifies that, immediately after the verdict was rendered, he took a carriage, and went to his home. He slept well during the night, and arose at about 9 A. M. on Thursday, April 27th. That since that day he has been regularly engaged in the transaction of his business. That on Friday, the 28th day of April, he left New York, by way of the New York Central Railroad, for Louisville, Ky., where he arrived on Saturday, April 29th. That he remained in Louisville until about 8 P. M., on Wednesday, May 3d. That he left Louisville, and arrived in Milwaukee on Thursday, May 4th. That during his stay in Louisville he stopped at Seelbach's Hotel. That he remained in Milwaukee until Saturday, May 6th, when he left for Chicago, arriving the same day. There he remained until Wednesday, May 10th, and then left for Pittsburgh, where he remained half a day, and then left for Harrisburg, Pa., where he arrived on Thursday, May 11th. He remained until Saturday morning, May 13th, and went to Lancaster, Pa., arriving the same day. He left Lancaster Saturday, May 13th, and arrived in New York on the same day, and remained in New York until Sunday night, May 14th, when he left for Baltimore. He arrived in Baltimore on Monday morning, and remained there until Wednesday, May 17th. From there he went to Washington, where he arrived the same day, and remained there until the 26th, when he left for Norfolk, Va., which place he left on the 27th, and arrived on the same day in the city of Richmond, Va. He remained in Richmond, Va., until Wednesday, May 31st; then left for Petersburgh, where he remained until 9 P. M., and from thence he went to Lynchburgh, arriving there June 1st. He left Lynchburgh the same day for Washington city, where he arrived June 1st. He remained in Washington until 5 P. M.; left for New York city, and arrived there at 12 o'clock midnight, and remained in New York until Sunday, June 4th, when he left for Boston, where he remained until the evening of June 6th. At all the places mentioned he regularly transacted the business of his employer in the usual manner. His evidence is sustained by original letters addressed to the district attorney, his wife, and his employer, with the envelopes in which the same were contained, bearing upon them the post-office stamp, and showing the times and places of their mailing; and his testimony is also sustained by that of Joel A. Kraus and Otto Seelbach, the person last named being the manager of the hotel at Louisville, where Mr. Paradise stayed;

and his testimony is also sustained by that of his wife and of Mr. Richard Schram, his employer. This testimony completely disposes of and renders worthless the evidence of John H. Welsh, which was in part relied upon by the medical experts as a basis for their opinions as to the mental condition of Mr. Paradise. Welsh states that on or about Wednesday, May 3, 1893, at 2 o'clock in the afternoon, while he was engaged in his store at No. 271 Greenwich street, in the city of New York, discussing with Mr. George W. Rockafellor the cases of Harris and Buchanan, a dark-complexioned man, who looked more like a Cuban than anything else, came into the store, and, as Mr. Rockafellor made the remark, "I should convict no one on circumstantial evidence," the man that came in asked to see a diamond which was in the store window, and, as Welsh turned to show it to him, Mr. Rockafellor left the store. "This gentleman [the man who came into the store] said to me, [referring to Mr. Rockafellor,] 'That gentleman remarked that he would not hang anybody on circumstantial evidence in a murder case,' and that he just came off of the jury in the Buchanan Case." Welsh said, "On what grounds did the jury convict Buchanan?" And the man said that he was Mr. Paradise, and that he did not himself acquiesce in the verdict; that he was taken sick at the Astor House, and that he was unconscious; that he did not vote to convict, although the rest of the jury said that he did do so, nor would he do so; and, in answer to the question, "Why didn't you tell the proper authorities about that?" he said that he had told the recorder and the district attorney, and that he had made an affidavit, but that the persons who had induced him to make the affidavit did not want it known. He was then asked why he did not go and see the counsel for the defendant, and he said that he had done so, and, furthermore, that the jury had accused him of being bribed before they went out; that he told them that he could give reference for his character; that he had worked for Claflin; that he had commenced for $2 a week, and got $35 a week when he left there. He said that he lost his situation through this, and that they had put another man in his place on the road; that they had to do so, or they would lose their entire spring trade; that Hugh Grant had been to see his employer, and that he was in hopes to get back. The man who represented himself as Mr. Paradise, the juror in the Buchanan Case, said that when the jury first went out upon their first ballot they stood six for conviction, four for acquittal, and two for murder in the second degree, and it was in this connection that he said that the jurors had accused him of being bribed. He also said: "I will bet $100 Buchanan gets a new trial. My affidavit will settle that." Mr. Paradise, in his affidavit, denies in the most positive terms that he ever was in Welsh's store, or that he ever had any conversation with him, and, as shown by the evidence already referred to, it is clear that Mr. Paradise, the juror, was not the man represented in Welsh's affidavit; and upon the evidence I am

convinced that Welsh's affidavit was concocted for the purpose of obtaining a medical opinion affecting the mental condition of Mr. Paradise, and also for the purpose of deceiving the court. While I have arrived at this conclusion in respect to Welsh's affidavit, I desire to state here that I do not believe that either of the leading counsel engaged in the defense of the prisoner had any knowledge of the manner in which said affidavit was procured.

4. The medical evidence introduced by the district attorney, in addition to that of Drs. Pritchard and Schram, already referred to, is that (1) of Dr. Carlos F. McDonald, president of state commission in lunacy of this state, in which he states that on the 13th of June, 1893, in conjunction with Drs. Starr and A. E. McDonald, and in the presence of Drs. Schram and Pritchard, he made a careful personal examination of Mr. Paradise, for the purpose of determining his mental condition; that such examination embraced his life history and heredity, as stated by himself, and his medical history, as obtained from Drs. Schram and Pritchard; that a minute and detailed examination of Mr. Paradise's physical condition, including his pulse, tongue, facial expression, tendon reflexes, pupils, skin, co-ordinating powers, motor functions and speech, his memory as to dates and events, his general intelligence and reasoning powers, and the testimony of Dr. Stewart, the physician who attended Mr. Paradise at the Astor House, and the affidavits of Thomas F. Barrett and Waverly E. Scott, to which reference has already been made. As the result of said examination and information, he is of the opinion that Mr. Paradise is not now suffering from any form of mental or nervous disease; that his history shows that he has not at any time suffered from any form of epilepsy or insanity; that, in his opinion, the symptoms and conditions described in the testimony of Dr. Stewart and the affidavits of Barrett and Scott were those of nervous exhaustion, and were of an hysterical character, resulting from the long-continued strain and the confinement incident upon his duties as a juror; and, further, that Paradise was at all times during the deliberations of the jury, and up to the time of his attack on the evening of the 26th of April, 1893, rational, and fully competent to perform his duty as a juror by participating in their deliberations and arriving at a verdict; and that on his recovery from said attack, and on his return to court on that evening, he was again fully competent to discharge his duty as a juror. (2) Dr. Moses Allen Starr, in his testimony, states that he personally questioned and examined Mr. Paradise, in association with Dr. A. E. McDonald and Dr. Carlos F. McDonald, in the presence of Drs. Schram and Pritchard; that he questioned and examined Mr. Paradise, obtaining from him his family history, which he found to be good, his father having died of old age at 80, his mother still living at the age of 86; that she has two sisters living, in good health. Three brothers died, two in childhood and one in adult life, of bowel trouble. Paradise stated that he had always been a healthy man, of good habits, and able to attend to his business, excepting for occasional slight ailments

of the nature of malaria and grip, for which ailments he had been attended by Dr. Schram, who corroborated his statements as to the nature of these complaints. Paradise also stated that he never had a serious illness during his life, and this statement is corroborated by Dr. Schram, who had known him intimately for eight years. That on four occasions he had fainted away, the last time on April 26, 1893. The history which he gives of these four faints is clear and intelligent. Each of these attacks occurred subsequent to a nervous strain, to overheating, or to a malarial attack. Each has been preceded by a feeling of faintness. In each he has lost consciousness momentarily, and he has recovered rapidly, but still felt nauseated, after which he has been quite conscious, and clear as to his sensations. In none of these attacks has he hurt himself or bitten his tongue, and, after recovering consciousness, he has never felt weary, has never been stupid, and has never slept heavily. That he never had attacks of vertigo; has never found stains upon his pillow upon awaking in the morning; has never wet the bed. His description of these attacks makes it evident that they are not epileptiform in character, and they are not in any manner like the fit of epilepsy. In regard to the attack occurring on April 26, 1893, Paradise states that he had been under great physical and mental strain during the 29 hours of deliberation. That he had eaten little during that time, and felt much exhausted. Soon after entering the very hot dining room in which dinner was served, he felt faint, and called for brandy, but before it was brought he fainted away. He remembered awaking in bed, the doctors and others being about him. That his tongue was not sore. That he felt no unnatural fatigue or pain in his muscles. That he recognized those about him. The description of his attack is not that of epilepsy, but is quite consistent with the fainting attack due to nervous excitement and exhaustion. That, having read the affidavit or statement of Dr. W. H. Stewart, and also the affidavits of Thomas R. Barrett and Waverly E. Scott, regarding the attack, he finds in them no facts which point to the attack having been due to epilepsy or epileptiform in character. The facts all point to the attack having been one of syncope, followed by slight nervousness, without mental aberration, and that the physical examination of Mr. Paradise fails to reveal any evidence whatever of physical or mental disease. That the pupils are of medium size and equal, react to light, and in accommodation. The eyes are perfect; no tremor of the lips, face, or tongue; no deviation of the tongue; no scars upon the tongue; slight indentations of tongue corresponding to defective teeth; all motions of face perfect; no tremor of hands; no ataxis of extremities; stands firmly with eyes closed; constant difference of 20 dynometers between hands; normal knee jerks; no heart murmur of any kind whatever; capillary circulation in extremities good; gait perfect; no tenderness of spine; all movements perfect; no scars of any kind about the head or face, the hair being closely cropped; speech clear, without thickness or defective utterance; manner quiet and self-composed; statements

rapid and clear; language well chosen; no hesitation of thought, no defect of memory; clear recollection of all facts; and no inconsistency of statements as to facts, life, and health, as to the dates of his illnesses, or as to the occurrences in connection with his fainting attacks; no exaggeration of manner; no boastfulness, but quiet and logical statements, without emotional excitement, or any evidence of exaltation or depression. From the facts stated, and from the result of a careful physical examination, the witness concludes that Mr. Paradise is a fairly healthy man; that he has never at any time in his life been the subject of epilepsy or of epileptiform attacks; and that he is not at present suffering from epilepsy. He further declares it to be his opinion that Mr. Paradise is of sound mind, in the full possession of his faculties, and has never at any time suffered from any mental disease; and that at present he has no sign of any mental disease whatever; and that he is further of the opinion that the attack from which Mr. Paradise suffered on April 26, 1893, was of the nature of syncope, due to nervous exhaustion, and that it did not interfere in any way with his mental capacity or power of judgment before the time of its occurrence; and that within a short time after its occurrence he was undoubtedly as mentally sound and capable of exercising judgment as before its occurrence.

5. Dr. Alexander E. McDonald, in his testimony, after stating that he made a personal examination of Mr. Paradise with a view to determining his mental and physical condition, and with reference especially to the existence or nonexistence of general paresis and of epilepsy, says that he is of the opinion, based upon such examination, that there is no perceptible symptom or indication of either disease, either past or present, but that, on the contrary, Mr. Paradise is in full possession of his mental faculties, and has, to the best of his opinion and belief, been in such mental condition and free from such diseases during the period of his life, and up to this time. I have already referred to and quoted so much of Dr. Stewart's testimony as referred to the mental condition of Mr. Paradise on the night of the 26th of April, when he attended him at the Astor House. His opinion, based upon his treatment of Mr. Paradise on that occasion, and such information as he received from Mr. Paradise's son, to which reference has already been made, was that the juror did not suffer from epilepsy in any of its forms; and that his illness was caused by exhaustion; and that prior to the attack, and after his recovery therefrom, he was as mentally capable of performing his duty as a juror as any of his fellows. Barrett's testimony, so far as it bore upon the mental and physical condition of the juror, is as follows:

"That he saw several men come out of the dining room bearing the body of another man [doubtless Mr. Paradise] with them, whom they laid down on the floor in the alcove, opposite the door where the office used to be. He seemed very ill, suffering apparently from convulsions, twitching all the while, and requiring the strength of three or four men to hold him, one holding each arm and one the head; and that subsequently, and about 11 o'clock, they brought the sick man downstairs, two men holding him and assisting him, and put him in a carriage with the doctor."

Scott's testimony, bearing upon the same question, is to the following effect: That he saw Mr. Paradise when lying on the floor, and the others around him, and subsequently, when he came down stairs, assisted by two men. The evidence of Mr. Franceville, although not admissible, having a tendency to affect or impair his verdict as a juror, which bears upon the question of Mr. Paradise's mental capacity, is to the effect that he saw him about falling from his chair. That he was carried out of the dining room, and laid upon the floor of the alcove. That he went down "like a shot," and was unconscious, and was supported or held by several persons. He did not see him after he was removed upstairs, and until he joined the main body of the jurors. That he saw a great deal of Paradise during the trial, and more especially during their deliberations when the cause was finally submitted to the jury to decide. He appeared to be sick, and was complaining during the greater portion of the trial, especially in the latter days thereof; seemed irritable, excited, and extremely nervous; complained bitterly upon not being permitted to go to bed; stated that the recorder could not keep him out of bed, and that he would sue the recorder and the county. That he appeared when making use of those expressions, to be nervous and excited, and that, during the last 24 hours of the trial, he appeared to be abstracted, and unusually nervous and excited, as if the protracted strain was mentally and physically wearing upon him. He told him that he would hold him personally responsible for his life, and that his life was worth more than that fellow's downstairs. The material portions of the testimony of Mr. Franceville have been contradicted by others of the jury, all of whom concur in stating that they observed nothing in the manner or conduct of Mr. Paradise which showed any more nervousness and excitement than what would be reasonably produced by the protracted trial, and as to the expressions about suing the recorder and the county, and about holding Mr. Franceville responsible for his life, those are explained by Mr. Paradise himself, who says that they were made jocosely. The expert evidence bearing upon the question of the mental condition of Mr. Paradise is conflicting. The opinions of the experts upon which the defendant relies are to the effect that Mr. Paradise was mentally incapable of performing his duties as a juror, and that his incapacity to do so arises from a disease of an epileptic form, from which he was suffering, and one of them goes so far as to hold that he is now suffering from general paresis. The opinions of the experts upon which the people rely are to the effect that the juror was mentally capable of performing his duties on the occasion in question, and that the illness from which he suffered was not caused by any disease of an epileptic form, and that he had never suffered from any such disease, nor is he the victim of general paresis.

For the purpose of testing the correctness of these opinions, a reference to the evidence upon which they are severally based became necessary, and I have quoted at sufficient length the evidence upon which each set of experts acted. The defendant's experts based

their opinions upon the testimony of Dr. Stewart, that of Mr. Paradise's son, and upon the ex parte affidavits of Barrett, Welsh, Franceville, and Scott, without having made any personal examination of the juror. The people's experts, on the other hand, not only made a careful, scientific, and personal examination of the juror, but they also had the benefit of the statements of Drs. Pritchard and Schram, the juror's family physicians. Estimating the value of the conflicting opinions according to well-known rules of law, I should be compelled to adopt the opinions of the people's experts, but, in addition to the expert evidence presented by the people, the evidence of 10 of Mr. Paradise's fellow jurors, that of his wife, and also of his employer, as well as the evidence of Mr. Paradise, to which reference has already been made, was presented by the people, and, in my opinion, fully sustains the opinions of the people's experts. Applying to all the evidence the well-established rule of law that the testimony of experts is entitled to the same credit and is to be tested by the same rules as are to be applied to the testimony of other witnesses, and should have weight according to their qualifications and opportunities, while their opinions are not conclusive, they are to receive so much weight as a jury may deem it entitled to, when viewed in connection with all the other circumstances, and they must also be predicated upon the facts established by the proofs in the case, I have arrived at the conclusion, after a careful examination of all of the evidence upon which these opinions are predicated, that the opinions of the experts produced by the people are warranted by the evidence, while the opinions of the defendant's experts are not. I cannot but believe that if the evidence which is before me bearing upon this subject had been before the learned experts for the defendant, or if they had submitted Mr. Paradise to the same scientific examination to which he was submitted by the people's experts, they would have arrived at a different opinion in respect to his mental capacity than that to which they have given expression. Entertaining the views herein expressed in regard to the several motions made by the defendant, it follows that they, and each of them, must be denied.